FILED
CLERK, U.S. DISTRICT COURT

NOV - 6 2009

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

AMIL FRLUCKAJ,                    )    NO. ED CV 08-01019-MMM(E)
                                  )
            Petitioner,           )
                                  )
      v.                          )    ORDER ADOPTING FINDINGS,
                                  )
L. SMALL, Warden,                 )    CONCLUSIONS AND RECOMMENDATIONS
                                  )
            Respondent.           )    OF UNITED STATES MAGISTRATE JUDGE
                                  )
_____    )

    Pursuant to 28 U.S.C. section 636, the Court has reviewed the Petition, all of the records herein and the attached Report and Recommendation of United States Magistrate Judge.  The Court approves and adopts the Magistrate Judge's Report and Recommendation.

    IT IS ORDERED that Judgment be entered denying and dismissing the Petition with prejudice.

///
///
///
///

1    IT IS FURTHER ORDERED that the Clerk serve copies of this Order,

2 the Magistrate Judge's Report and Recommendation and the Judgment

3 herein by United States mail on Petitioner and counsel for

4 Respondent.

5

6    LET JUDGMENT BE ENTERED ACCORDINGLY.

7

8    DATED: October 30, 2009

9

10

11    _____

12    MARGARET M. MORROW
      UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| AMIL FRLUCKAJ, | ) | NO. ED CV 08-1019-MMM(E) |
|                 Petitioner, | ) | |
| v. | ) | REPORT AND RECOMMENDATION OF |
| L. SMALL, Warden, | ) | UNITED STATES MAGISTRATE JUDGE |
|                 Respondent. | ) | |
| _____ | ) | |

This Report and Recommendation is submitted to the Honorable Margaret M. Morrow, United States District Judge, pursuant to 28 U.S.C. section 636 and General Order 05-07 of the United States District Court for the Central District of California.

**PROCEEDINGS**

Petitioner filed a "Petition for Writ of Habeas Corpus By a Person in State Custody" on July 29, 2008, accompanied by a Memorandum of Points and Authorities ("Pet. Mem.") and Exhibits ("Pet. Ex."). Respondent filed a Motion to Dismiss on October 20, 2008, alleging

1  that Petitioner had not exhausted all of his claims.  Petitioner filed

2  an Opposition to the Motion to Dismiss on November 5, 2008, contending

3  that Petitioner's claims were exhausted and that, in the alternative,

4  Petitioner was entitled to a stay pursuant to Rhines v. Weber, 544

5  U.S. 269 (2005).

6

7       On February 17, 2009, the Court issued a Memorandum and Order

8  deeming unexhausted Petitioner's claim that trial counsel

9  ineffectively conceded Petitioner's guilt on the kidnapping charge in

10  closing argument.  In the same Memorandum and Order, the Court denied

11  Petitioner's request for a stay.  The Court ordered Petitioner to

12  file, within thirty days of the date of the Memorandum and Order,

13  either a request to amend the Petition to delete and abandon

14  Petitioner's unexhausted claim or a request to dismiss the entire

15  Petition without prejudice.  On March 3, 2009, Petitioner filed a

16  "Request to Amend the Petition to Delete and Abandon Petitioner's

17  Unexhausted Claim."  On March 4, 2009, the Court issued a Minute Order

18  deeming the Petition to be amended to delete and abandon Petitioner's

19  unexhausted claim and ordering Respondent to file an Answer to the

20  Petition as amended.

21

22       On April 27, 2009, Respondent filed an Answer.  On June 8, 2009,

23  Petitioner filed a Reply, accompanied by a Memorandum of Points and

24  Authorities ("Reply Mem.").

25

26                              **BACKGROUND**

27

28       Between March 19, 2002 and March 31, 2002, in Riverside County,

1  Petitioner robbed a Radio Shack, a Circle K, an ARCO gas station
2  convenience store, a Thrifty gas station convenience store and a 7-
3  Eleven (Reporter's Transcript ["R.T."] 17-36, 93-108, 111-15, 119-32,
4  168-85, 191-208).  Videotapes from surveillance cameras at each
5  location showed Petitioner committing each robbery (R.T. 33-35, 104-
6  07, 128-30, 181-85, 205-07).  Petitioner's fingerprints matched those
7  found at the Radio Shack (R.T. 48-52, 71-75, 90-92).  Petitioner
8  admitted to investigators that Petitioner had committed the robberies,
9  but said he had used a pellet gun (R.T. 238, 256, 260; Clerk's
10  Transcript ["C.T."] 119-22, 131-32, 136-37, 140-41, 150).
11  Petitioner's confederate Ernesto Amaya told investigators that Amaya
12  accompanied Petitioner while Petitioner committed the Circle K, ARCO
13  and 7-Eleven robberies (R.T. 249-52).  Amaya pled guilty to the four
14  robberies (R.T. 145, 155-58).

15

16      On May 31, 2003, Petitioner approached Asad Milbes in a Penny
17  Mart parking lot in Rubidoux, California (R.T. 262-69).  Petitioner
18  pulled a gun from his waistband and demanded money (R.T. 270).  When
19  Milbes said he had no money, Petitioner poked the side of Milbes' head
20  with the nozzle of the gun and said "Give me the money or I'll shoot
21  you" (R.T. 271-72).  When Milbes gave Petitioner money from Milbes'
22  wallet, Petitioner said that he had been following Milbes and knew
23  Milbes had gone to a bank (R.T. 272-73).  Petitioner entered Milbes'
24  car and ordered Milbes to drive to an ATM and withdraw money (R.T.
25  273-75).  Milbes drove to a Washington Mutual Bank, but there were
26  many cars in the drive-through, so Petitioner told Milbes to ask
27  someone where a Bank of America was located (R.T. 277).  Milbes asked
28  a woman for the location of a Bank of America (R.T. 277-78).

3

1  Petitioner ordered Milbes to drive to the Bank of America, with the
2  gun pointed in Milbes' side (R.T. 277).  Petitioner told Milbes that
3  if Milbes tried anything Petitioner would shoot Milbes (R.T. 276-79).
4  At the Bank of America ATM, Milbes withdrew $700, but Petitioner,
5  dissatisfied with the amount, demanded that Milbes use his credit
6  cards to withdraw more money (R.T. 280-83).  When Milbes said he did
7  not know the PIN numbers, Petitioner instructed Milbes to drive to a
8  jewelry store and use the credit cards to buy jewelry for Petitioner
9  (R.T. 283).

10

11      Milbes drove to the Tyler Mall in Riverside (R.T. 279-86).
12  Milbes used back streets, and the trip took 20 to 25 minutes (R.T.
13  279).  Petitioner held the gun to Milbes' side "on and off" during the
14  ride (R.T. 279).  It was a Saturday, and the mall was very busy (R.T.
15  286, 291).  Milbes parked in a handicapped parking spot, thinking that
16  a police officer might see Milbes doing so (R.T. 287).  Petitioner
17  walked into the mall behind Milbes (R.T. 288).  Petitioner repeatedly
18  warned Milbes that Petitioner would shoot Milbes if Milbes tried
19  something (R.T. 288).

20

21      The two visited five or six jewelry stores (R.T. 289).
22  Petitioner found something he liked, but Milbes said the price
23  exceeded Milbes' credit limit (R.T. 290).  In an attempt to get away,
24  Milbes told Petitioner that Milbes needed to use the bathroom (R.T.
25  291).  At an elevator on the second floor, Petitioner walked in front
26  of Milbes for the first time (R.T. 292).  Seizing this opportunity,
27  Milbes hit Petitioner and tried unsuccessfully to push Petitioner over
28  a railing (R.T. 293).  Milbes then "bear-hugged" Petitioner and the

4

1  two fell to the ground (R.T. 293-96).  Milbes yelled that Petitioner

2  had a gun and was trying to shoot him (Milbes) (R.T. 295-96).  Milbes

3  had his hands underneath Petitioner fighting for the gun (R.T. 296).

4  A passerby and an off-duty deputy sheriff assisted Milbes in

5  overpowering Petitioner (R.T. 297-99, 326-34).  The deputy took

6  custody of the gun, which was a Smith & Wesson revolver containing

7  three live rounds (R.T. 330, 334).  Officers took from Petitioner the

8  $700 Milbes had withdrawn from the ATM and returned the money to

9  Milbes (R.T. 304).  Petitioner was taken from the scene on a stretcher

10  (R.T. 304).

11

12      At trial, Petitioner's counsel conceded that Petitioner had

13  committed the March robberies, but argued that the evidence did not

14  support the allegations that Petitioner had personally used a firearm

15  in committing those robberies (R.T. 433-35, 436-40).  Counsel conceded

16  that Petitioner had kidnapped and robbed Milbes using a "real gun,"

17  but argued that Petitioner had not committed kidnapping for the

18  purpose of robbery (R.T. 442).

19

20      A jury found Petitioner guilty of kidnapping for robbery, two

21  counts of first degree robbery (7-Eleven robbery and robbery of

22  Milbes), four counts of second degree robbery (Radio Shack, Circle K,

23  ARCO, and Thrifty), and one count of assault with a firearm on Milbes

24  (R.T. 504-09).  The jury hung on the allegations that Petitioner had

25  personally used a firearm in the March robberies, and the court

26  dismissed those allegations at sentencing (R.T. 500, 515).  The jury

27  found true the allegations that Petitioner had personally used a

28  firearm in the commission of the Milbes robbery, the kidnapping for

5

1  robbery, and the aggravated assault (R.T. 504-09).  The court found
2  true the allegation that Petitioner committed the Milbes offenses
3  while released on bail (R.T. 511).  Petitioner received a sentence of
4  23 years and four months and a consecutive term of seven years to life
5  (R.T. 516-20).

6

7      Petitioner appealed, alleging that his sentence violated Apprendi
8  v. New Jersey, 530 U.S. 466 (2000) ("Apprendi"), and Blakely v.
9  Washington, 542 U.S. 296 (2004) ("Blakely").  On June 8, 2006, the
10 Court of Appeal issued a decision modifying the judgment to provide
11 that the sentence on the kidnapping for robbery count was life with
12 the possibility of parole, but otherwise affirming the judgment (Pet.
13 Ex. A, pp. 5-6; People v. Frluckaj, 2006 WL 1555936, at *2 (Cal. Ct.
14 App. 4th Dist. June 8, 2006).  On August 16, 2006, the California
15 Supreme Court denied Petitioner's petition for review "without
16 prejudice to any relief to which defendant might be entitled after the
17 United States Supreme Court determines in Cunningham v. California,
18 No. 05-6551, the effect of Blakely v. Washington (2004) 542 U.S. 296
19 and United States v. Booker (2005) 543 U.S. 220, on California law"
20 (Petition, Ex. B).

21

22     On October 18, 2006, Petitioner was resentenced on the kidnapping
23 for robbery count to a consecutive term of life with the possibility
24 of parole (Pet. Ex. C).

25

26     Petitioner filed a habeas corpus petition in the Riverside County
27 Superior Court, which that Court denied on October 10, 2007 (Pet.
28 Ex. D; Reply Ex. P; Respondent's Lodgment 1).  Petitioner filed a

1  habeas corpus petition in the California Court of Appeal, which that

2  Court denied summarily (Pet. Ex. E; Respondent's Lodgments 2, 3).

3  Petitioner filed a habeas corpus petition in the California Supreme

4  Court, which that Court denied on July 9, 2008 "without prejudice to

5  any relief to which petitioner might be entitled after this court

6  decides In re Gomez, S155425: whether a habeas petitioner whose

7  conviction became final after Blakely v. Washington (2004) 542 U.S.

8  296 but before Cunningham v. California (2007) 549 U.S. 270, is

9  entitled to the benefit of the high court's decision in Blakely" (Pet.

10  Exs. F, I, J).[1]

11

12                     **PETITIONER'S CONTENTIONS**

13

14      Petitioner contends:

15

16      1.   The trial court allegedly violated Petitioner's rights under

17  Apprendi, Blakely and Cunningham v. California, 549 U.S. 270 (2007)

18  ("Cunningham") by sentencing Petitioner to an upper term and by

19  imposing a consecutive sentence; and

20

21      2.   Petitioner's trial counsel allegedly rendered ineffective

22  assistance, assertedly by: (a) failing to investigate and present the

23  testimony of Omer Gilic; (b) failing to request a voluntary

24  intoxication instruction; (c) failing to investigate and present

25  _____

26      [1]   On February 2, 2009, the California Supreme Court
    issued its decision in In re Gomez, 45 Cal. 4th 650, 653, 88 Cal.

27  Rptr. 3d 177, 199 P.3d 574 (2009), holding that Cunningham
    "applies on collateral review to a judgment that became final

28  before Cunningham was decided but after Blakely."

1   evidence of Petitioner's alleged voluntary intoxication at trial and

2   at sentencing; (d) failing to deliver an opening statement outlining

3   the defense strategy; and (e) conceding Petitioner's guilt on the

4   robbery charges in closing argument, allegedly without consulting

5   Petitioner.

6

7                          **STANDARD OF REVIEW**

8

9        Under the "Antiterrorism and Effective Death Penalty Act of 1996"

10   ("AEDPA"), signed into law April 24, 1996, a federal court may not

11   grant an application for writ of habeas corpus on behalf of a person

12   in state custody with respect to any claim that was adjudicated on the

13   merits in state court proceedings unless the adjudication of the

14   claim: (1) "resulted in a decision that was contrary to, or involved

15   an unreasonable application of, clearly established Federal law, as

16   determined by the Supreme Court of the United States"; or

17   (2) "resulted in a decision that was based on an unreasonable

18   determination of the facts in light of the evidence presented in the

19   State court proceeding." 28 U.S.C. § 2254(d) (as amended); see also

20   Woodford v. Visciotti, 537 U.S. 19, 24-26 (2002); Early v. Packer, 537

21   U.S. 3, 8 (2002); Williams v. Taylor, 529 U.S. 362, 405-09 (2000).

22

23        "Clearly established Federal law" refers to the governing legal

24   principle or principles set forth by the Supreme Court at the time the

25   state court renders its decision. Lockyer v. Andrade, 538 U.S. 63

26   (2003). A state court's decision is "contrary to" clearly established

27   Federal law if: (1) it applies a rule that contradicts governing

28   Supreme Court law; or (2) it "confronts a set of facts. . . materially

8

1  indistinguishable" from a decision of the Supreme Court but reaches a

2  different result.  See Early v. Packer, 537 U.S. at 8 (citation

3  omitted); Williams v. Taylor, 529 U.S. at 405-06.

4

5      Under the "unreasonable application prong" of section 2254(d)(1),

6  a federal court may grant habeas relief "based on the application of a

7  governing legal principle to a set of facts different from those of

8  the case in which the principle was announced."  Lockyer v. Andrade,

9  538 U.S. at 76 (citation omitted); see also Woodford v. Visciotti, 537

10  U.S. at 24-26 (state court decision "involves an unreasonable

11  application" of clearly established federal law if it identifies the

12  correct governing Supreme Court law but unreasonably applies the law

13  to the facts).

14

15      A state court's decision "involves an unreasonable application of

16  [Supreme Court] precedent if the state court either unreasonably

17  extends a legal principle from [Supreme Court] precedent to a new

18  context where it should not apply, or unreasonably refuses to extend

19  that principle to a new context where it should apply."  Williams v.

20  Taylor, 529 U.S. at 407 (citation omitted).

21

22      "In order for a federal court to find a state court's application

23  of [Supreme Court] precedent 'unreasonable,' the state court's

24  decision must have been more than incorrect or erroneous."  Wiggins v.

25  Smith, 539 U.S. 510, 520 (2003) (citation omitted).  "The state

26  court's application must have been 'objectively unreasonable.'"  Id.

27  at 520-21 (citation omitted); see also Davis v. Woodford, 384 F.3d

28  629, 637-38 (9th Cir. 2004).

9

1    In applying these standards, this Court looks to the last

2  reasoned state court decision.  See Delgadillo v. Woodford, 527 F.3d

3  919, 925 (9th Cir. 2008).  To the extent no such reasoned opinion

4  exists, as where a state court rejected a claim in an unreasoned

5  order, this Court must conduct an independent review to determine

6  whether the decisions were contrary to, or involved an unreasonable

7  application of, "clearly established" Supreme Court precedent.  See

8  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

9

10                              DISCUSSION

11

12  I.   **Petitioner's Challenges to His Sentence Do Not Merit Habeas**

13       **Relief.**

14

15       A.   **Background**

16

17    In Apprendi, the United States Supreme Court held that,

18  regardless of its label as a "sentencing factor," any fact other than

19  the fact of a prior conviction that increases the penalty for a crime

20  beyond the prescribed statutory maximum must be "proved beyond a

21  reasonable doubt."  Apprendi, 530 U.S. at 490.  In Blakely, the

22  Supreme Court held that the "statutory maximum" for Apprendi purposes

23  "is the maximum sentence a judge may impose *solely on the basis of the*

24  *facts reflected in the jury verdict or admitted by the defendant. . .*

25  *.* "  Blakely, 542 U.S. at 303 (original emphasis).

26

27    At sentencing, the court selected the robbery of Milbes as the

28  principal term and imposed the upper term because of the "threat of

                                   10

great violence and bodily harm" (R.T. 516, 518). The court imposed a consecutive ten-year term for the gun use allegation on that count (R.T. 517). The court imposed a consecutive one-year term for each count on the remaining robbery counts (R.T. 517-18). On the kidnapping for robbery count, the court imposed a consecutive indeterminate term of seven years to life (R.T. 517).[2] The court stayed the sentences on the remaining gun use allegations and the assault count (R.T. 520). The court imposed a consecutive two-year term for the "out-on-bail" allegation (R.T. 518). The court indicated that it had imposed the consecutive sentences on the ground that the crimes involved planning, sophistication and professionalism (R.T. 518).

On appeal, Petitioner contended that his upper term and consecutive sentences violated Apprendi and Blakely. The Court of Appeal rejected Petitioner's contentions as barred by People v. Black, 35 Cal. 4th 1238, 29 Cal. Rptr. 3d 740, 113 P.3d 534 (2005), vacated, 549 U.S. 1190 (2007), abrogated, Cunningham v. California, 549 U.S. 270 (2007) ("Black") (see Pet. Ex. A). Black held that California's statutory scheme providing for the imposition of upper term and consecutive sentences did not violate the constitutional principles set forth in Blakely.

On January 22, 2007, the United States Supreme Court issued its decision in Cunningham, holding that a California judge's imposition

---

[2]     As indicated above, the Court of Appeal modified the sentence on the kidnapping for robbery count to a term of life with the possibility of parole.

1   of an upper term sentence based on facts found by the judge (other

2   than the fact of a prior conviction) violated the constitutional

3   principles set forth in Blakely.   Cunningham expressly disapproved the

4   contrary holding and reasoning of Black.

5

6        Petitioner raised a Cunningham claim in his Riverside Superior

7   Court habeas petition (see Reply Ex. P; Respondent's Lodgment 1).   The

8   Superior Court rejected Petitioner's claim on the ground that

9   Cunningham was not retroactive (see Pet. Ex. D).   The Court of Appeal

10   summarily rejected Petitioner's challenge to his sentence, and the

11   California Supreme Court denied this claim without prejudice (see Pet.

12   Exs. B, E, F).   Therefore, the last reasoned state court opinion is

13   the opinion of the Riverside County Superior Court, rejecting this

14   claim on the ground that Cunningham assertedly was not retroactive.

15

16        In Butler v. Curry, 528 F.3d 624, 634-39 (9th Cir.), cert.

17   denied, 129 S. Ct. 767 (2008), the Ninth Circuit held that Cunningham

18   is retroactive.   Because the Riverside Superior Court applied an

19   incorrect legal standard, this Court's review is de novo.   See Frantz

20   v. Hazey, 533 F.3d 724, 735 (9th Cir. 2003) (en banc) ("we may not

21   grant habeas relief simply because of § 2254(d)(1) error and . . . if

22   there is such error, we must decide the habeas petition by considering

23   de novo the constitutional issues raised"); Butler v. Curry, 528 F.3d

24   at 641 (applying de novo review to Cunningham claim where Court of

25   Appeal's application of Black was contrary to clearly established

26   Supreme Court law); see also Panetti v. Quarterman, 551 U.S. 930, 127

27   S. Ct. 2842, 2855, 2858-59 (2007) (where state court's decision

28   constituted an unreasonable application of Supreme Court law, review

12

1    of petitioner's claim is "unencumbered by the deference [section
2    2254(d)] normally requires").

3

4    **B.    Challenge to Upper Term Sentence**

5

6        The sentencing court's imposition of an upper term sentence based
7    on the court's finding that the offense involved "threat of great
8    violence and bodily harm" violated <u>Cunningham</u>.   Respondent does not
9    contend otherwise, but argues that any error was harmless.

10

11        <u>Blakely/Cunningham</u> error is subject to harmless error analysis.
12   <u>See</u> <u>Washington v. Recuenco</u>, 548 U.S. 212, 222 (2006); <u>Butler v Curry</u>,
13   528 F.3d at 648.   Under the harmless error standard applicable in
14   federal habeas cases, the Court must determine whether the error had a
15   "substantial and injurious effect or influence" on Petitioner's
16   sentence.   <u>See</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637-38 (1993);
17   <u>Butler v. Curry</u>, 548 F.3d at 648.

18

19        Here, Petitioner did not dispute the prosecution's evidence
20   concerning the kidnapping, robbery and assault of Milbes, but argued
21   only that Petitioner did not commit kidnapping for robbery.   As
22   previously indicated, the jury found true the allegation that
23   Petitioner had personally used a firearm in the commission of the
24   Milbes robbery, the kidnapping for robbery, and the aggravated
25   assault.   The jury's finding of guilt on the assault charge indicates
26   that the jury believed Milbes' testimony that Petitioner put the gun

27

28

13

1   to Milbes' head.[3] Given the jury's verdict and the evidence that

2   Petitioner held the gun to Milbes' head and side and repeatedly

3   threatened to shoot Milbes if Milbes did not cooperate, a rational

4   jury could not have failed to find that the Milbes robbery involved a

5   "threat of great violence and bodily harm" warranting the imposition

6   of an upper term sentence. Therefore, any Cunningham error was

7   harmless. See Aleman v. Clark, 2009 WL 1041520, at *11 (C.D. Cal.

8   Apr. 16, 2009) (Cunningham error harmless, where there was "little

9   doubt" that jury would have determined that robbery at gunpoint

10  coupled with statement "Someone's gonna die" involved great violence

11  or the threat of bodily harm); see also People v. Douglas, 36 Cal.

12  App. 4th 1681, 1691-92, 43 Cal. Rptr. 2d 129 (1995) (finding that

13  threatening robbery victim with a gun "clearly involved the threat of

14  great bodily harm" sufficient to support upper term sentence); People

15  v. Reid, 133 Cal. App. 3d 354, 369, 184 Cal. Rptr. 186 (1982) (upper

16  term appropriate where defendant threatened to kill robbery victim).

17

18  **C.   Challenge to Consecutive Sentences**

19

20       The United States Supreme Court's decision in Oregon v. Ice, 129

21  S. Ct. 711 (2009) forecloses Petitioner's claim that the imposition of

22  consecutive sentences violated the principles set forth in Apprendi,

23  Blakely and Cunningham. This Court must apply the majority opinion in

24  Oregon v. Ice. See United States v. McCalla, 545 F.3d 750, 753 (9th

25  Cir. 2008), cert. denied, 129 S. Ct. 1363 (2009) (lower federal court

26  may not set aside or disregard United States Supreme Court precedent).

27  _____

28       [3]   The prosecution's theory was that Petitioner committed
    assault by putting the gun to Petitioner's head (see R.T. 431).

14

1   Petitioner's reliance on the dissenting opinion in <u>Oregon v. Ice</u> (<u>see</u>

2   Reply Mem., p. 9 & n.5) is unavailing.   <u>See</u> <u>United States v. Ameline</u>,

3   409 F.3d 1073, 1083 n.5 (9th Cir. 2005) (en banc) (Supreme Court

4   dissenting opinions "of course[] are not precedential").   Therefore,

5   Petitioner is not entitled to habeas relief on this claim.

6

7   **II.   <u>Petitioner's Claims of Ineffective Assistance of Counsel Do Not</u>**

8       **<u>Merit Habeas Relief.</u>**

9

10      Petitioner raised his claims of ineffective assistance of counsel

11  in his state court habeas petitions (<u>see</u> Pet. Ex. J; Respondent's

12  Lodgments 1, 2, 3).   Because the state courts rejected these claims

13  summarily, this Court must conduct an independent review to determine

14  whether the decisions were contrary to, or involved an unreasonable

15  application of, "clearly established" Supreme Court precedent.   <u>See</u>

16  <u>Delgado v. Lewis</u>, 223 F.3d at 982.

17

18  **A.   <u>Governing Legal Standards</u>**

19

20      To establish ineffective assistance of counsel, Petitioner must

21  prove: (1) counsel's representation fell below an objective standard

22  of reasonableness; and (2) there is a reasonable probability that, but

23  for counsel's errors, the result of the proceeding would have been

24  different.   <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 694, 697

25  (1984) ("<u>Strickland</u>").   A reasonable probability of a different result

26  "is a probability sufficient to undermine confidence in the outcome."

27  <u>Id.</u> at 694.   The court may reject the claim upon finding either that

28  counsel's performance was reasonable or the claimed error was not

1   prejudicial.  Id. at 697; Rios v. Rocha, 299 F.3d 796, 805 (9th Cir.

2   2002) ("Failure to satisfy either prong of the Strickland test

3   obviates the need to consider the other.") (citation omitted).  For

4   purposes of habeas review under 28 U.S.C. section 2254(d), Strickland

5   sets forth clearly established Federal law as determined by the United

6   States Supreme Court.  See Williams v. Taylor, 529 U.S. at 391

7   (citation and quotations omitted).

8

9        Review of counsel's performance is "highly deferential" and there

10  is a "strong presumption" that counsel rendered adequate assistance

11  and exercised reasonable professional judgment.  Williams v. Woodford,

12  384 F.3d 567, 610 (9th Cir. 2004), cert. denied, 546 U.S. 934 (2005)

13  (quoting Strickland, 466 U.S. at 689).  The court must judge the

14  reasonableness of counsel's conduct "on the facts of the particular

15  case, viewed as of the time of counsel's conduct."  Strickland, 466

16  U.S. at 690.  The court may "neither second-guess counsel's decisions,

17  nor apply the fabled twenty-twenty vision of hindsight."  Karis v.

18  Calderon, 283 F.3d 1117, 1130 (9th Cir. 2002), cert. denied, 539 U.S.

19  958 (2003) (citation and quotations omitted); see Yarborough v.

20  Gentry, 540 U.S. 1, 8 (2003) ("The Sixth Amendment guarantees

21  reasonable competence, not perfect advocacy judged with the benefit of

22  hindsight.") (citations omitted).  The test is "only whether some

23  reasonable lawyer . . . could have acted, in the circumstances, as

24  defense counsel acted."  Coleman v. Calderon, 150 F.3d 1105, 1113 (9th

25  Cir.), rev'd on other grounds, 525 U.S. 141 (1998) (citations and

26  quotations omitted); see also Babbitt v. Calderon, 151 F.3d 1170,

27  1173-74 (9th Cir. 1998), cert. denied, 525 U.S. 1159 (1999) (relevant

28  inquiry under Strickland is not what defense counsel could have

1  pursued, but rather whether the choices made by defense counsel were

2  reasonable) (citation and quotations omitted).   Petitioner bears the

3  burden to "overcome the presumption that, under the circumstances, the

4  challenged action might be considered sound trial strategy."

5  <u>Strickland</u>, 466 U.S. at 689 (citation and quotations omitted)

6

7      **B.    <u>Counsel's Alleged Failure to Investigate and Present the</u>**

8          **<u>Testimony of Omer Gilic</u>**

9

10     Petitioner contends counsel ineffectively failed to investigate

11 the allegations of Omer Gilic (Pet. Mem., pp. 33-35; Reply Mem.,

12 pp. 12-13, 16-18).   According to Petitioner, Gilic's testimony would

13 have shown that Petitioner did not possess the requisite mental state

14 to commit kidnapping for robbery (Pet. Mem., pp. 33-35).

15

16     Gilic's Declaration states that, sometime in the latter part of

17 2003, Milbes assertedly told Gilic that Milbes "had been the victim of

18 an attempted robbery but . . . had out-smarted the robber"

19 (Declaration of Omer Gilic, Pet. Ex. K ["Gilic Dec."], ¶ 2).   Gilic

20 relates that Milbes allegedly "stated this in a boastful manner and

21 indicated that he quickly determined that the would-be robber was

22 child-like and trusting so he [Milbes] decided to trick the robber,

23 save his money and set a trap to capture the thief" (Gilic Dec., ¶ 3).

24 According to Gilic, Milbes allegedly "appeared to be very proud of his

25 trap to capture the robber and explained in detail how he made up a

26 story about not having any cash other than what was in his wallet,

27 although there was around $25,000 in the trunk of his car, and offered

28 to buy jewelry at a jewelry store" (Gilic Dec., ¶ 4).   Milbes

17

1   allegedly told Gilic that Milbes "knew that once he got the robber

2   inside a jewelry store he [Milbes] would be safe because there would

3   be other people around and security at this type of store [was] always

4   high" (Gilic Dec., ¶ 5).  Milbes allegedly told Gilic that the "trick

5   worked," and "the robber accepted his [Milbes'] offer and Milbes drove

6   the robber to what he [Milbes] described as 'his certain capture'"

7   (Gilic Dec., ¶ 6).  Milbes allegedly said Milbes "charmed the robber,

8   gained his trust and stalled until he [Milbes] felt secure enough to

9   make his move" (Gilic Dec., ¶ 7).  Milbes allegedly told Gilic that

10  Milbes "felt in control the whole time" and "was extremely proud that

11  his [Milbes'] quickly-put-together plan succeeded so well" (Gilic

12  Dec., ¶ 8).  Gilic allegedly told Petitioner's father about Gilic's

13  conversation with Milbes, and said Gilic would testify about the

14  conversation with Milbes (Gilic Dec., ¶ 10).  According to Gilic, no

15  lawyer or investigator ever called or spoke with Gilic (R.T. 12).

16

17      At trial, Petitioner's counsel asked Milbes on cross-examination

18  whether Milbes had ever told someone named "Omar" that Milbes was not

19  afraid during the incident (R.T. 307).  Milbes denied making this

20  statement, saying he [Milbes] told "Omar" that in the beginning Milbes

21  was afraid but that he began to relax a little in the car because

22  Milbes assertedly knew that Petitioner would not shoot Milbes at least

23  until after Petitioner "got what he wanted" (R.T. 308).  It is unclear

24  whether "Omar" was Omer Gilic.  In any event, for the reasons

25  discussed below, even assuming, arguendo, Petitioner's counsel

26  unreasonably failed to investigate Gilic, Petitioner has not shown a

27  reasonable probability of a different result had counsel investigated

28  Gilic and called Gilic to testify.

1    Petitioner contends that Gilic's testimony assertedly would have

2  impeached Milbes' testimony and "raised questions" regarding:

3  (1) whether Petitioner purportedly acted under duress; and (2) whether

4  the movement of Milbes substantially increased the risk of harm over

5  and above that necessarily present in the Penny Mart parking lot (Pet.

6  Mem., p. 35).   Petitioner also contends Milbes assertedly tricked

7  Petitioner into committing the kidnapping by leading Petitioner to

8  believe Milbes voluntarily was taking Petitioner shopping, thereby

9  allegedly inducing Petitioner to commit the crime (Pet. Mem., pp. 33-

10  35).

11

12    Gilic's testimony would not have impeached to any significant

13  extent Milbes' testimony concerning the events surrounding the

14  kidnapping, robbery and assault.   Gilic's testimony did not call into

15  question Milbes' testimony concerning the sequence of events,

16  including the taking of Milbes' money in the car and at the ATM,

17  Milbes' long drive to the mall at gunpoint, Petitioner's repeated

18  threats to shoot Milbes, and Petitioner's insistence on visiting

19  multiple jewelry stores at the mall.   Indeed, Gilic's testimony was

20  largely consistent with that of Milbes.   Milbes, a Palestinian,

21  testified, among other things, that: (1) Milbes had learned in the

22  Middle East how to react to violence; (2) Milbes lied to Petitioner in

23  the car about having no more money; (3) Milbes was trying to play a

24  role in order to keep Petitioner calm; (4) Milbes drove to the mall to

25  find a jewelry store because Milbes thought there would be a lot of

26  people in the mall and it would be a lot safer; (5) and Milbes told

27  Petitioner that Milbes wanted to use the restroom because Milbes

28  thought Milbes could get away from Petitioner or perhaps locate a

1 police officer (R.T. 289-92, 306-08, 312-13, 316-17).  Milbes'

2 testimony and Gilic's statement both show that, <u>after the kidnapping</u>

3 <u>had begun</u>, Milbes was trying to keep Petitioner calm while Milbes

4 looked for an opportunity to escape or for assistance.  Gilic's

5 statement does not suggest that Milbes influenced Petitioner to commit

6 kidnapping.

7

8       Furthermore, Gilic's proposed testimony would not have shown

9 Petitioner acted under duress.  In California, duress can negate the

10 intent or capacity to commit a crime.  <u>See</u> <u>People v. Petznick</u>, 114

11 Cal. App. 4th 663, 676, 7 Cal. Rptr. 3d 726 (2003); Cal. Penal Code §

12 26.  A person acts under duress when he or she has reasonable cause to

13 believe, and does believe, that his or her life will be in "immediate

14 and imminent danger" if he or she refuses to perform the allegedly

15 compelled act.  <u>People v. Heath</u>, 207 Cal. App. 3d 892, 900, 255 Cal.

16 Rptr. 120 (1989) (citations omitted); Cal. Penal Code § 26, ¶ 6.

17 Nothing in Gilic's proposed testimony would have suggested that

18 Petitioner kidnapped Milbes because Petitioner reasonably believed

19 Petitioner's life was in "immediate and imminent" danger.  Nor would

20 Gilic's testimony have supported a defense of entrapment.  <u>See</u> <u>People</u>

21 <u>v. Serrata</u>, 62 Cal. App. 3d 9, 25-26, 133 Cal. Rptr. 144 (1976)

22 (defense of entrapment unavailable where person allegedly entrapping

23 defendant was a private party, not a law enforcement officer); <u>People</u>

24 <u>v. Gregg</u>, 5 Cal. App. 3d 502, 509, 85 Cal. Rptr. 273 (1970) (same).

25

26       Finally, nothing in Gilic's proposed testimony would have

27 impugned trial proof of the "substantially increased risk of harm"

28 element of the crime of kidnapping for robbery.  "Kidnapping for

1  robbery, or aggravated kidnapping, requires movement of the victim

2  that is not merely incidental to the commission of the robbery, and

3  which substantially increases the risk of harm over and above that

4  necessarily present in the crime of robbery itself." People v.

5  Rayford, 9 Cal. 4th 1, 11, 36 Cal. Rptr. 2d 317, 884 P.2d 1369 (1994)

6  (citation and internal quotations omitted).  Testimony that Milbes

7  purportedly conceived a plan to "charm" or "trick" Petitioner into

8  going to a jewelry store to facilitate Petitioner's apprehension would

9  not have detracted from the compelling evidence of a "substantially

10 increased risk of harm" resulting from Petitioner having forced Milbes

11 to drive for a considerable period of time at gunpoint.  See People v.

12 Sanford, 63 Cal. App. 3d 952, 959, 134 Cal. Rptr. 155 (1976), cert.

13 denied, 431 U.S. 969 (1977) ("The 'risk of harm' test is satisfied

14 when the victim is forced to travel a substantial distance under a

15 threat of imminent injury by a deadly weapon.") (citations omitted);

16 People v. Daniels, 202 Cal. App. 3d 671, 683-84, 248 Cal. Rptr. 753

17 (1988) (forcing victim to drive to shopping mall at gunpoint and

18 poking victim in the head with the gun showed substantial risk of harm

19 to victim over and above that necessarily present in the crime of

20 robbery, even though gun later was shown to be unloaded).

21

22     For all of these reasons, Petitioner has not shown a reasonable

23 probability of a different result if Gilic had testified in the manner

24 alleged by Petitioner, and hence has not shown Strickland prejudice.

25 ///

26 ///

27 ///

28 ///

21

C.   **Counsel's Failure to Request a Voluntary Intoxication
Instruction**

Although California has abolished the diminished capacity
defense, evidence of voluntary intoxication remains relevant "to the
extent it bears upon the question whether the defendant *actually* had
the requisite specific mental state required for commission of the
crimes at issue." People v. Horton, 11 Cal. 4th 1068, 1119, 47 Cal.
Rptr. 2d 516, 906 P.2d 478 (1995), cert. denied, 519 U.S. 815 (1996)
(citation omitted; original emphasis).   A defendant is entitled to a
voluntary intoxication instruction "only when there is substantial
evidence of the defendant's voluntary intoxication and the
intoxication affected the defendant's 'actual formation of specific
intent.'"  People v. Williams, 16 Cal. 4th 635, 677, 66 Cal. Rptr. 2d
573, 941 P.2d 752 (1997), cert. denied, 523 U.S. 1027 (1998) (citation
omitted).   A voluntary intoxication instruction is not required unless
there is evidence to show that the defendant "became intoxicated to
the point he failed to form the requisite intent."  People v. Ivans,
2 Cal. App. 4th 1654, 1661, 4 Cal. Rptr. 2d 66 (1992).

The only evidence at trial concerning Petitioner's possible
voluntary intoxication was Milbes' testimony that Petitioner appeared
to be under the influence of something (R.T. 311).  However, Milbes
said he reached this conclusion not from Petitioner's speech, but
"just from looking" (R.T. 311).  Milbes explained: "People don't just
rob people.  I'm thinking maybe the guy is on something, you know, to
make some stupid decision like that" (R.T. 311).  Thus, Milbes
inferred Petitioner was under the influence only because, in Milbes'

1   mind, sober people would not commit such a "stupid" robbery.  There

2   was no trial evidence that Petitioner had ingested any drugs or

3   alcohol prior to the incident, and certainly no evidence that

4   Petitioner was so intoxicated that he was unable to form the intent to

5   commit kidnapping for robbery.  Counsel reasonably could have

6   concluded that requesting a voluntary intoxication instruction would

7   be futile.  Strickland does not require an attorney to make a futile

8   motion.  See Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996), cert.

9   denied, 519 U.S. 1142 (1997) ("the failure to take a futile action can

10  never be deficient performance").  For the same reason, Petitioner has

11  not shown that counsel's failure to request a voluntary intoxication

12  instruction prejudiced Petitioner.  Given the state of the evidence,

13  the trial court would have denied any such request.[4]

14

15       D.   Counsel's Failure to Present Alleged Evidence of Asserted

16            Voluntary Intoxication

17

18       Petitioner alleges that his asserted voluntary intoxication at

19  the time of the kidnapping allegedly "may have prevented" Petitioner

20  from forming the requisite intent to commit the crime (Pet. Mem.,

21  pp. 33-34).  Petitioner contends his trial counsel unreasonably failed

22  to present the testimony of medical experts concerning the alleged

23  voluntary intoxication (Pet. Mem., pp. 41-42).  Petitioner relies on

24  Milbes' testimony, the declaration of John C. Elserodt, dated

25  August 30, 2007, and the declaration of attorney Douglas Bader, dated

26  _____

27       [4]   To the extent Petitioner contends counsel failed to
    introduce evidence sufficient to support such an instruction, the
28  Court addresses that issue below.

1 | December 13, 2007 (Pet. Exs. M, N).

2 |

3 |     In Dr. Hiserodt's declaration, Dr. Hiserodt opines that on the

4 | day of the kidnapping Petitioner assertedly was under the influence of

5 | "multiple drugs including marijuana and amphetamine during the time

6 | period in which he [Petitioner] was involved in the robbery and

7 | subsequent events," which assertedly "significantly contributed to his

8 | confusion and poor judgement [sic] related to the crime" (Pet. Ex. M).

9 | According to Dr. Hiserodt, an ambulance report on May 31, 2003

10 | indicated that Petitioner had a fast heartbeat, high blood pressure,

11 | and elevated cardiac enzymes, and that Petitioner was sweating

12 | profusely and confused (Pet. Ex. M).  A urine drug screen allegedly

13 | showed positive for marijuana and amphetamine (Pet. Ex. M).

14 | Petitioner allegedly told medical staff that Petitioner had taken

15 | "speed" (Pet. Ex. M).  Over the next 24 hours, Petitioner's cardiac

16 | enzymes assertedly returned to normal levels, and his heart rate and

17 | blood pressure assertedly returned to normal levels consistent with

18 | the "known half-life of amphetamine" (Pet. Ex. M).  Dr. Hiserodt

19 | opines that Petitioner's physical symptoms assertedly were consistent

20 | with "amphetamine overdose," and that it is "likely that the

21 | psychological effects including confusion and impaired judgement [sic]

22 | were at play in the commitment of the robbery and the events following

23 | the robbery" (Pet. Ex. M).

24 |

25 |     In his declaration, attorney Bader opines that Petitioner's trial

26 | counsel should have obtained an expert to interpret the results of

27 | Petitioner's blood tests on the day of his arrest, and should have

28 | presented a medical doctor or chemical expert as a defense witness at

24

1  trial (Pet. Ex. N).

2

3       Assuming, _arguendo_, that Petitioner's counsel unreasonably failed

4  to investigate a voluntary intoxication defense and/or unreasonably

5  failed to obtain medical experts regarding such a defense, Petitioner

6  has failed to show resulting _Strickland_ prejudice.

7

8       Dr. Hiserodt's declaration and the records described therein do

9  not show that, at the time of the kidnapping incident, Petitioner was

10  so intoxicated that he was unable to form the requisite specific

11  intent.  At best, this alleged evidence shows only that Petitioner

12  assertedly had ingested marijuana and amphetamine at some point prior

13  to Petitioner's apprehension at the mall, and that it was "likely"

14  that Petitioner suffered from "confusion" and "poor judgment" due to

15  the ingestion of amphetamine.  Dr. Hiserodt did not opine that

16  Petitioner's alleged condition was such that Petitioner was incapable

17  of forming an intent to kidnap Milbes for the purpose of robbing

18  Milbes.

19

20       Moreover, the trial evidence belies any assertion that any

21  alleged "confusion" and "lack of judgment" rendered Petitioner

22  incapable of forming the intent to kidnap Milbes for the purpose of

23  robbery.  Milbes' testimony showed that Petitioner was articulate and

24  aware throughout the incident, and deliberately intended to kidnap

25  Milbes in order to take Milbes' money.  Petitioner demanded money and

26  expressed dissatisfaction with the contents of Milbes' wallet.

27  Petitioner indicated that he had followed Milbes and knew Milbes had

28  visited a bank.  Petitioner entered Milbes' car, pointed a gun at

1   Milbes, threatened to shoot Milbes, and told Milbes to drive to an
2   ATM.   When Petitioner saw that the Washington Mutual Bank was busy,
3   Petitioner told Milbes to find a Bank of America.   When Milbes said he
4   could not remember his credit card PIN numbers, Petitioner told Milbes
5   to find a jewelry store.   At the mall, Petitioner went from store to
6   store in order to locate jewelry to his liking.   These were hardly the
7   words and actions of one so profoundly under the influence of drugs as
8   to be incapable of forming the intent to kidnap Milbes for the purpose
9   of robbing him.

10

11      In light of Milbes' testimony concerning Petitioner's words and
12   actions during the incident, Dr. Hiserodt's opinion that it was
13   "likely" that drugs caused Petitioner's supposed "confusion" and "poor
14   judgment" would not have persuaded anyone that Petitioner lacked the
15   capacity to form the intent to kidnap Milbes for the purpose of
16   robbery.   Petitioner has not shown a reasonable probability that, had
17   counsel investigated a voluntary intoxication defense and called
18   Dr. Hiserodt as a witness, the result would have been different.

19

20      Petitioner also faults his counsel for failing to present alleged
21   mitigating evidence at sentencing (Pet. Mem., p. 44).   Petitioner
22   alleges that, at sentencing, Petitioner's counsel alluded to "what
23   drugs do to a young man," but assertedly failed to investigate "how
24   this [i.e., drug use] may be relevant to the sentencing proceedings"
25   (Pet. Mem., p. 44).   Petitioner otherwise does not identify what
26   evidence Petitioner asserts counsel should have presented at
27   sentencing.   In his California Supreme Court habeas petition, to which
28   Petitioner refers in the present Petition (see Pet. Mem., p. 44),

26

1   Petitioner alleged that he committed the March robberies while "in a

2   state of drug induced delirium," and that his counsel assertedly knew

3   "that the events at issue here were the result of drug-induced

4   psychosis resulting from a methamphetamine binge" (see Pet. Ex. J,

5   p. 34).

6

7       The record contains no evidence even arguably supporting these

8   assertions other than the declaration of Dr. Hiserodt, discussed

9   above, and a letter from an intake coordinator of a residential

10   educational organization for former alcoholics, attached to attorney

11   Bader's declaration and dated June 17, 2004, indicating that the

12   organization tentatively had accepted Petitioner for entry into the

13   program (see Pet. Ex. N, exhibit).  Dr. Hiserodt's declaration and the

14   medical records to which the declaration refers do not show that

15   Petitioner suffered from any "delirium" or "drug induced psychosis"

16   when he committed the crimes.  Indeed, neither Dr. Hiserodt's

17   declaration nor the alleged medical records mentioned therein state

18   any facts or conclusions with respect to the March robberies.  The

19   allegation that a residential center for recovering alcoholics offered

20   Petitioner a placement over a year after Petitioner's crimes does not

21   support Petitioner's argument that Petitioner committed his crimes

22   while suffering from an alleged drug-induced "delirium" or

23   "psychosis."  Furthermore, as indicated above, the trial evidence

24   showed Petitioner was lucid and articulate when he kidnapped Milbes to

25   rob him.  In these circumstances, Petitioner has not shown that

26   counsel's alleged failure to present asserted mitigating evidence

27   prejudiced Petitioner within the meaning of Strickland.

28   ///

27

**E.   Counsel's Failure to Present an Opening Statement**

At the start of trial, Petitioner's trial counsel reserved opening statement (R.T. 16). At the start of the defense case, Petitioner's counsel elected not to make an opening statement (R.T. 380). Petitioner alleges that trial counsel failed to make an opening statement "outlining the defense strategy because he [counsel] had developed no strategy for the defense" (Pet. Mem., pp. 42-43).

"The timing of an opening statement, and even the decision whether to make one at all, is ordinarily a mere matter of trial tactics and in such cases will not constitute the incompetence basis for a claim of ineffective assistance of counsel." United States v. Rodriguez-Ramirez, 777 F.2d 454, 458 (9th Cir. 1984); see also LaGrand v. Stewart, 133 F.3d 1253, 1275 (9th Cir.), cert. denied, 525 U.S. 971 (1998). "It is well-settled that the decision to waive an opening or closing statement is a commonly adopted strategy, and without more, does not constitute ineffective assistance of counsel." Fox v. Ward, 200 F.3d 1286, 1296 (10th Cir.), cert. denied, 531 U.S. 938 (2000).

The record shows that the strategy of Petitioner's counsel was to concede the robberies but to contest (successfully as it turned out) the firearm use allegations with respect to the March robberies, and to argue that Petitioner did not commit aggravated kidnapping. Petitioner does not allege any facts showing why counsel's decision to waive opening statement was unreasonable, or how that decision harmed Petitioner. Therefore, Petitioner has shown neither counsel's unreasonableness nor any prejudice resulting therefrom.

**F.    Counsel's Alleged Concession of Guilt on the Robbery Charges**
**Without Consulting Petitioner**

As previously noted, in closing argument Petitioner's counsel conceded Petitioner's guilt on the robbery charges (R.T. 433-35). Petitioner contends that his counsel ineffectively did so without consulting Petitioner (Pet. Mem., p. 43). In Florida v. Nixon, 543 U.S. 175 (2004), the Supreme Court indicated that defense counsel has an obligation to explain to the defendant counsel's proposed strategy of conceding guilt at the guilt phase of a capital trial, but has no additional obligation to obtain the defendant's express consent to this strategy. Id. at 189. Here, assuming arguendo that counsel ineffectively failed to consult with Petitioner as Petitioner alleges, see United States v. Thomas, 417 F.3d 1053, 1056 (9th Cir. 2005), cert. denied, 546 U.S. 1121 (2006) (making similar assumption), Petitioner has not shown a reasonable probability that a different strategy would have produced a different result. As discussed previously, the prosecution introduced surveillance videotapes of the March robberies and Petitioner's admission to police that he committed those robberies. The evidence was also overwhelming that Petitioner committed the Milbes robbery (Petitioner was apprehended, after the struggle for the gun in the mall, in possession of Milbes' $700).[5] On such a record, Petitioner has not shown Strickland prejudice. See

_____

[5]    Petitioner argues that his counsel should have investigated whether Petitioner had the requisite state of mind for kidnapping for robbery (see Pet. Mem., pp. 33-35). However, the evidence or other facts outside the record would not have given counsel any reasonable ground to contest the prosecution's evidence that Petitioner committed the Milbes robbery.

1  United States v. Thomas, 417 F.3d at 1059 (counsel's concession of

2  guilt not prejudicial given strength of prosecution's evidence);

3  Haynes v. Cain, 298 F.3d 375, 382-83 (5th Cir.), cert. denied, 537

4  U.S. 1072 (2002) (counsel's failure to obtain defendant's consent

5  before conceding guilt not prejudicial where prosecution presented

6  "nearly conclusive" evidence of guilt).

7

8  **G.   Conclusion**

9

10  For all of the foregoing reasons, the state courts' rejection of

11  Petitioner's claims of ineffective assistance of counsel was not

12  contrary to, or an objectively unreasonable application of, any

13  clearly established Federal law as determined by the United States

14  Supreme Court.  See 28 U.S.C. § 2254(d).  Petitioner is not entitled

15  to habeas relief on these claims.

16

17  RECOMMENDATION

18

19  For the foregoing reasons, IT IS RECOMMENDED that the Court issue

20  an Order: (1) approving and adopting this Report and Recommendation;

21  and (2) denying and dismissing the Petition with prejudice.

22

23  DATED:  June 26, 2009.

24

25  _____/S/_____

CHARLES F. EICK

26  UNITED STATES MAGISTRATE JUDGE

27

28

30

**NOTICE**

Reports and Recommendations are not appealable to the Court of Appeals, but may be subject to the right of any party to file objections as provided in the Local Rules Governing the Duties of Magistrate Judges and review by the District Judge whose initials appear in the docket number.   No notice of appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the judgment of the District Court.